68 U.S. 582 (1863)
1 Wall. 582
RODRIGUES
v.
UNITED STATES.
Supreme Court of United States.

*585 Mr. Gillet, for the appellant.
Mr. Willes, who filed a brief of Mr. Stow, contra.
*587 Mr. Justice MILLER delivered the opinion of the court.
No class of cases that come before this court are attended with so many and such perplexing difficulties as these locations by survey of confirmed Mexican grants in California. The number of them which we are called upon to decide bears a very heavy disproportion to the other business of the court, and this is unfortunately increasing instead of diminishing. Some idea of the difficulties which surround these cases may be obtained by recurring to the loose and indefinite manner in which the Mexican government made the grants which we are now required judicially to locate. That government attached no value to the land, and granted it in what to us appears magnificent quantities. Leagues instead of acres were their units of measurement, and when an application was made to the government for a grant, which was always a gratuity, the only question was whether the locality asked for was vacant and was public property. When the grant was made, no surveyor sighted a compass or stretched a chain. Indeed, these instruments were probably not to be had in that region. A sketch, called a diseño, which was rather a map than a plat of the land, was prepared by the *588 applicant. It gave, in a rude and imperfect manner, the shape and general outline of the land desired, with some of the more prominent natural objects noted on it, and a reference to the adjoining tracts owned by individuals, if there were any, or to such other objects as were supposed to constitute the boundaries. Their ideas of the relation of the points of the compass to the objects on the map were very inaccurate; and as these sketches were made by uneducated herdsmen of cattle, it is easy to imagine how imperfect they were. Yet they are now often the most satisfactory, and sometimes the only evidence by which to locate these claims.
These difficulties have rather been increased than diminished by the act of Congress of March 3d, 1851, entitled "An act to ascertain and settle the private land claims in the State of California," and the course of proceedings adopted under it by the Board of Commissioners and the courts. Before this board every person having a claim derived from the Mexican government appeared, and in his own way and to the best of his ability established his right. The primary object of the act was to ascertain and separate the public domain from that which had become, under the Mexican government, private property; and hence, in every case, the claimant was plaintiff, or actor, and the United States was defendant. But no other private claimant was made a party to the proceeding, and it may well be supposed, and indeed we know it has often happened, that two or three claims for the same land, or parts of the same, were progressing, pari passu, in the same court, and the land has been confirmed to each claimant, and probably each has received a patent for it. As if aware of the confusion which must follow such proceedings, the act of 1851 provides expressly that neither the final decree of the Board of Commissioners, or of the District or Supreme Court, or any patent to be issued under that act, shall be conclusive against any one but the claimant and the United States. In some instances the board, or the court, would construe the grant and accompanying espediente, and define the boundaries with particularity. In others, they merely confirmed the grant, without any attempt *589 at location. And in still other cases, they would partially define the boundaries, and refer to the espediente for that which was left indefinite.
Then came the act of 1860, which attempted to settle these difficulties in the making of the surveys under those decrees, by permitting, or perhaps we should say compelling (for it is yet to be determined whether every one interested is not bound to come in or be barred), all parties interested in the land covered by the survey, to come in and contest it. Are they permitted to contest the decree under which the survey is made? Or are they limited to denying that the survey conforms to the decree? Or can they only contest the matter where the decree has not definitely located the grant? Many such questions as these will arise under this act, and will require great care and reflection to arrive at sound, safe conclusions. In this proceeding new parties come before the court, and often demonstrate that grants have been confirmed, which necessarily conflict; and, upon a question of the location of a survey, we have all the contests renewed which should have been settled in the question of title.
The case before us is an example, containing as many of the perplexities to which we have alluded as can well exist in one case. Its consideration requires an examination of three different claims, which have each, independently of the other, been carried through the Board of Commissioners and courts, and finally confirmed.
The first of these, that of Gonzales, was the oldest in reference to the date of the grant from Mexico, being made in 1833. No party to the present record seeks to disturb its location, and it is only to be considered here as bounding the present claim. It is for three-fourths of a league, bounded by the sea on the west, and the Butano Creek on the south. The next grant in order of time is that to the present claimants, under Ramona Sanchez. She, in 1837, made application for a half league of land, and the governor issued to her a provisional concession for a league in 1838. Of the location of this we will speak hereafter. Next came Simeon Castro, who, in 1842, obtained from the government a grant *590 of four square leagues, bordering to the east on the Sierra, to the west on the sea, to the north on the rancho of Don Juan Gonzales, and to the south on that of Don Ylaria Buelna.
In the provisional concession of Governor Alvarado, of 19th September, 1838, to Ramona Sanchez, the land is said to be known by the name of Butano, and reference is made to the espediente for its description. This must mean the diseño accompanying her petition. In the final grant to her in 1844, by Micheltorena, which is expressed to be a ratification of the provisional title given her in 1838, it is called the Butano ranch, and is described as bordering on the ranch of the heirs of Simeon Castro, on the Serrania, and on the sea. Now, an examination of the diseño in her espediente, the place of her residence, and her long possession under the grant, with other matters, leave no doubt that if her grant was to bound on the sea she must come between Gonzales and Castro; yet Castro's grant calls for the grant of Gonzales as his northern boundary. This would leave no place for the location of claimant's land, where it seems reasonably certain it was intended to be. How are we to adjust these conflicting claims?
In the first place, we concur with the District Court in holding, that the language of the grant to Castro, which makes his northern boundary the rancho of Gonzales, is a mistake, and that it was only intended to extend north to the Arroyo Frijoles, instead of the Arroyo Butano, which latter is the southern boundary of Gonzales; and that between these two, and bounded by the sea on the west, is the half league petitioned for by Sanchez, constituting the valuable portion of the league granted her by the governor.
It would extend this opinion to an unreasonable length, discussing mere facts and inferences, to go into all the reasons which justify this conclusion. They are stated at length, and with much clearness, in the opinion of Judge Hoffman of the District Court. Among them may be mentioned the fact, that the land granted to Castro originally constituted two independent ranches, for one of which, the most northern, *591 a grant had been previously issued to one Bernal, but which was surrendered by Castro when he took out a new grant including both ranches. On the diseño accompanying his petition these two are laid down, together with other natural objects, corresponding with a survey of the coast since made, so as to show that the tract did not extend so far north. The diseño attached to the original grant to Bernal, the one that was surrendered, shows also that its northern boundary was the Arroyo Frijoles. The diseño found with the petition of Sanchez shows that her grant must have occupied the space between the Arroyo Butano and Arroyo Frijoles. Now, if the Mexican governor really intended that Castro should join Gonzales on the north, there was no place for the grant to Ramona Sanchez, which, he says, is bounded by the sea on the west, and borders on the lands of the heirs of Castro.
It is objected to this location of the grant that it places it on land which has already been confirmed, surveyed, and patented to the representatives of Castro. The answer to this is, that we are called on in this proceeding to determine where the grant to the present claimant ought rightfully to be located, who was not a party to any of the proceedings by which Castro's claim was confirmed, surveyed, or patented, and is not therefore bound or concluded by either the decree, survey, or patent, as expressly enacted by the fifteenth section of the act of 1851. For Castro's survey was made before the act of 1860, and there was no opportunity for this claimant to contest its location. And lastly, it may be added, that the holder of the Castro claim has made himself a party to the present proceeding, and must be bound by its result; and if the errors of his grant and survey are corrected, so that the boundary of both claims shall be rightfully established, no wrong can accrue either to him or claimant.
It has been strenuously urged that if the original half league petitioned for by Sanchez has been correctly located, that the remainder of the league granted her should be taken out of the surplus of the Gonzales grant, instead of extending the grant eastward to the Sierra for quantity. It is sufficient *592 to say that we see no reason for making the distorted survey which this would require, and encroaching upon settlers who have made pre-emptions, merely that claimant may get better land than he does by extending his grant eastward to the mountains, as his grant seems to demand.
On the whole case, without that full and satisfactory conviction of the entire soundness of the decree below, which is desirable, but which is perhaps unattainable in many of these cases, we see no better course than to
AFFIRM THE DECREE.